# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,
        Plaintiff,

vs.                                                                                                                  No. CR 17-2956 JAP

**MIKE Y. ARCHULETA**, and
**CODY DAVIS**
        Defendants.

## MEMORANDUM OPINION AND ORDER

On May 5, 2018, the Court entered an Memorandum Opinion and Order ("Order") (Doc. 89) denying Plaintiff United States' ("Government") motion[1] to admit five text messages as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). On May 15, 2018, the Government responded to the Court's Order with a motion[2] asking the Court to reconsider and reverse its Order and/or to clarify findings in the Order. Alternatively, the Government asked the Court to consider admitting the five text messages as nonassertive utterances. On May 25, 2018, Defendants Mike Y. Archuleta and Cody Davis responded[3] to the Government's Motion, arguing that the Court's analysis was correct and that the evidence is not admissible under any other theory or that the Government's failure to argue earlier the admissibility of the text messages under another theory forecloses that argument here. The Government replied[4] on June 1, 2018, stating that it had previously asked for the five text messages to be admitted as non-hearsay.

---

[1] MOTION TO ADMIT CO-CONSPIRATOR STATEMENTS (Doc. 45).
[2] MOTION TO RECONSIDER AND CLARIFY ORDER DENYING UNITED STATES' MOTION TO ADMIT CO-CONSPIRATOR STATEMENTS (Doc. 90) ("Motion").
[3] JOINT RESPONSE IN OPPOSITION TO UNITED STATES' MOTION TO RECONSIDER AND CLARIFY ORDER DENYING UNITED STATES' MOTION TO ADMIT CO-CONSPIRATOR STATEMENTS (Doc. 91) ("Response").
[4] UNITED STATES' REPLY TO DEFENDANTS' RESPONSE TO MOTION TO RECONSIDER AND CLARIFY ORDER DENYING UNITED STATES' MOTION TO ADMIT CO-CONSPIRATOR STATEMENTS (Doc. 92)("Reply").

After considering the arguments in the Government's Motion, the Defendants' Response and the Government's Reply, as well as all evidence and arguments presented before and during the *James* hearings, the Court denies the Motion.

## BACKGROUND

*Facts Leading to Defendants' Indictment[5]*

In December 2015, United States Fish and Wildlife Services ("USFW") and the New Mexico Department of Game and Fish ("NMDGF") began conducting surveillance on Defendant Cody Davis for an alleged violation of the Lacy Act.[6]

On March 26, 2016, NMDGF executed a search warrant at the home of Mr. Davis's brother. A lapel video of this event shows Mr. Davis threatening NMDGF officers that he would have their jobs. On the day of the execution of the warrant, Mr. Davis took photos and videos of NMDGF officers and their vehicles. Before and after Mr. Davis took the photos and videos, he had several telephonic conversations with Defendant Mike Y. Archuleta. The frequency of the calls between the two Defendants on March 26, 2016 were unusual when compared to the number of calls in the days preceding the execution of the search warrant, March 23 through March 25, 2016, and the days following the execution of the search warrant, March 27 through April 1, 2016.

On June 8, 2016, as part of an ongoing investigation of Mr. Davis, USFW and NMDGF continued to conduct surveillance of Mr. Davis. Officer S.C., who was employed by NMDGF and cross-commissioned by USFW, surveilled Mr. Davis using his personal vehicle. While Officer S.C. was in his vehicle following Mr. Davis, he observed Mr. Davis taking pictures and possibly filming him.

---

[5] To clarify the Order, the Court includes facts omitted from the original Order that the Government contends are significant.
[6] *See* 16 U.S.C. § 3372

On June 8, 2016 at 9:23 a.m., Mr. Davis sent a text message to Mr. Archuleta stating, "call me asap". Phone records show that Mr. Davis tried to call Mr. Archuleta. At 9:52 p.m., Mr. Davis texted Mr. Archuleta "793stn", which was the license plate number of Officer S.C.

Telephone records indicate that on June 9, 2016, at 8:46 a.m., Mr. Davis called NMDGF and spoke with investigator Officer Darrell Cole. Mr. Davis told Officer Cole that a Toyota was following him and that the plate indicated that the car was associated with NMDGF. Mr. Davis asked Officer Cole why NMDGF was following him. Officer Cole told Davis he did not know who was following him.

At 10:11 a.m., Mr. Archuleta contacted a Quick MVD office in Española. A few minutes later, Mr. Archuleta sent a text message to Mr. Davis with the home address of Officer S.C.

Between 12:49 p.m. and 3:26 p.m. on June 9, 2016, Mr. Davis drove by the home of Officer S.C. multiple times. During that same period, he approached the front entrance of the home three times, took photos of the home, and spoke on the phone with Mr. Archuleta four times. Mr. Davis and Mr. Archuleta spoke on the phone twice more during the day. At 5:34 p.m., Mr. Davis sent Mr. Archuleta a text stating, "How do you spell the GW name"? At 5:35, Mr. Archuleta replied with the full name of Officer S.C.

On October 24, 2017, a Grand Jury indicted Mike Y. Archeleta and Cody Davis for knowingly and willfully conspiring and agreeing together and with each other on June 8, 2016 through June 9, 2016 to prevent by intimidation S.C., a law enforcement officer with NMDGF and cross-deputized with USFW, from discharging the duties of the USFW in violation of 18 U.S.C. § 372.

On April 5, 2018, the Court began a *James* hearing on the admissibility of the five text messages as coconspirator statements. The hearing was continued to April 9, and to May 2,

2018. On April 10, 2018, the day following the second day of the *James* hearing, the Government filed a superseding indictment that revised the beginning date of the charged conspiracy to March 2016.

***The Court's May 5, 2018 Order***

On May 5, 2018, the Court entered an Order denying the Government's motion to admit the five text messages as coconspirator statements. In the Order, the Court stated that it had considered evidence the Government introduced through witness Officer Roper. The evidence included the following:

> the five text messages at issue, timelines Officer Roper prepared that document phone calls between the Defendants in March 2016 and in June 2016, videos taken from Mr. Davis' phone on March 26, 2016, a USFW Officer's lapel video of the March 25, 2016 execution of a search warrant at the home of Mr. Davis' brother, maps detailing the Defendants' movement on June 9, 2016 and photos, some of which were taken from Mr. Davis' phone, some of which were taken from a camera in Officer S.C.'s front yard and some of which were taken by the Government. (Doc. 89, pp. 4-5).

In the Order, the Court summarized the Government's argument as follows:

> (1) the two Defendants exchanged several phone calls between March 23, 2016 and April 1, 2016 and because Mr. Davis took pictures and videos following the calls, and because Mr. Davis threatened to have USFW officers' jobs when on March 25, 2016 USFW officers executed a search warrant at the home of the brother of Mr. Davis, it is a reasonable inference that at or about that time, the two Defendants agreed to enter into a conspiracy to impede USFW officers in the performance of their duties;
>
> (2) the evidence shows that in June 2016 the two Defendants agreed to obtain USFW Officer S.C.'s address and they could only want a USFW officer's address for an unlawful purpose;
>
> and
>
> (3) the evidence shows that the Defendants were friends who exchanged several phone calls, which means that Mr. Archuleta must have known and agreed that Mr. Davis would go to Officer S.C.'s home to intimidate him. (Doc. 89, p. 5).

The Court found with respect to the Government's first argument:

> The March 2016 time link between the Defendant's exchange of phone calls and Mr. Davis' subsequent photographic and videographic documentation is not evidence of an agreement to impede by intimidation USFW officer S.C. in the performance of his duties. (Doc. 89, pp. 5-6).

The Court found with respect to the Government's second argument:

> Defendants' act of obtaining USFW Officer S.C.'s identity and address also is not per se evidence of an agreement to perform a common unlawful objective. The Government offered no evidence that Mr. Archuleta knew of or agreed with Mr. Davis' decision to go to Officer S.C.'s home. (Doc. 89, p. 6).

The Court found with respect to the Government's third argument:

> Similarly, a friendship between two people does not inexorably lead to an inference of a joint unlawful objective. (Doc. 89, p. 6).

The Court concluded: "In the absence of independent evidence establishing an agreement between the Defendants to complete this offense there can be no conspiracy." *Id*. On that basis, the Court held that the five text messages do not fall within the coconspirator exception found in Fed. R. Evid. 801(d)(2)(E). *Id.*

## STANDARD OF REVIEW

Although the Federal Rules of Criminal Procedure do not authorize the filing of motions to reconsider, it is well established that district courts are allowed to correct "alleged errors in [their] dispositions." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014). In a criminal case, the court may grant a motion to reconsider "when the court has misapprehended the facts, a party's position, or the law." *Id.* Circumstances warranting reconsideration include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Id.* A motion to reconsider is not an appropriate vehicle for the losing party to revisit issues already addressed, reformulate stronger

arguments in favor of its position, or advance arguments that could have been raised earlier. *United States v. Huff*, 782 F.3d 1221, 1224 (10th Cir. 2015). The decision to grant a motion to reconsider rests in the sound discretion of the district court. *Id.*

## DISCUSSION

In its Order, the Court denied the admission of five text messages as coconspirator statements because the Government produced no evidence of an agreement between the Defendants to commit the charged crime of Conspiracy to Impede or Injure an Officer in violation of 18 U.S.C. § 372. The Government claims that the Court erred because the Court did not take into consideration all the evidence presented at the *James* hearing about events that occurred in March 2016 and in June 2016 and so made factual findings inconsistent with undisputed facts. Alternatively, the Government asks the Court to admit the text messages as relevant nonassertive utterances.

**A.     The Court's Factual Findings**

*1.     Evidence of Events that Occurred on March 25 through March 26, 2016*

At the *James* hearing, the Government presented evidence of a March 26, 2016 search under a warrant conducted by NMDGF at Mr. Davis's brother's home. The purpose of the search warrant was to find an illegally taken deer head. Defendant Cody Davis was present during the execution of the warrant. In its Order, the Court stated that the execution of the search warrant occurred on March 25, 2018 when it actually occurred on March 26, 2018. The Government contends that this mistake about the date the warrant was executed means that Court did not take into consideration the following relevant facts: 1) during the execution of the search warrant, Mr. Davis took pictures and videos of NMDGF officers and of their vehicles; and 2) on March 26, 2016, at or around the same time Mr. Davis took the pictures and videos, he also spoke several

6

times on the phone with Mr. Archuleta. The Government asserts that if the Court had properly considered this evidence there could have been only one conclusion: Mr. Archuleta must have known about the execution of the search warrant and that knowledge led to an agreement between him and Mr. Davis to impede an investigation by intimidating an officer in the performance of his duties in violation of 18 U.S.C. § 372. This argument relies upon inference upon inference, and is a misreading of the elements of § 372.

Despite the Court's mistaken statement of the date of the execution of search warrant, the Court did consider the facts surrounding the events of March 25 and March 26, 2018 and did review the timeline of events. After considering all evidence, the Court found that the time link between the events, specifically the collection of the phone and video evidence coupled with several phone calls between the two Defendants did not establish an inference of an unlawful agreement between the two Defendants to use threat or intimidation to prevent Officer S.C. from performing his official duties. As the Court stated in its Order:

> Even if the Government's argument were sound that the time link between these events creates a reasonable inference of a joint intention to intimidate any USFW officer, that tenuous inference does not establish an agreement to commit the objectives of the crime with which the Defendants are charged, which specifies Officer S.C. as the object of their unlawful agreement. (Doc. 89, p. 6).

When the March 2016 events occurred, neither Defendant knew that Officer S.C. would be involved in an investigation of Mr. Davis in June 2018.

The Government argues that it is immaterial that Officer S.C. was not present during the March 2016 events because an element of the charged offense is the existence and knowledge of an underlying investigation to impede. The Government misreads the statute. Section 372 requires: "(1) two or more persons to conspire (2) to prevent any person from discharging the duties of their office under the United States (3) by force, intimidation, or threat." *United States*

7

*v. Rakes*, 510 F.3d 1280, 1288 (10th Cir. 2007). The focus of § 372 is not on a specific investigation, but on a conspiracy to prevent a specific individual from discharging his duties.[7] To complete this offence, the Defendants must have made an agreement to impede someone not something. At the time the March 2016 events occurred, Officer S.C. was not a participant in the investigation of Mr. Davis so the Defendants could not have made any agreement as to him.

However, even if the statute contemplated an agreement between two or more people to impede an investigation that may morph into an agreement to impede a particular individual from discharging his duties, the events of March 2016 do not support an inference that the two Defendants entered into such an agreement. The evidence suggests only that Mr. Archuleta may have known of the March 2016 events that involved Mr. Davis, including the investigation, photos, and videos. Knowledge of this nature is not enough to establish an agreement between two people to do something in the future.[8]

### 2. *Evidence of Events that Occurred on June 8 and June 9, 2016*

Next, the Government argues that the Court's description of what occurred on June 8 and 9, 2016 left out important times and sequence of events. Specifically, the Government argues the following:

> The court's recitation of the facts occurring on June 8, 9, 2016 leaves out the important times and sequence of events involving when the defendants called each other, when Davis spoke with NMDGF officer Darrell Cole, when Archuleta phoned the Quick MVD in Espanola, and the defendant's communications in relation to the activities of Davis on

---

[7] The indictment lists Officer S.C. as the individual who the Defendants agreed to impede in the performance of his duties.

[8] The Government also argues the March 2016 events are admissible evidence as *res gestae* of the crime because those events provide context. The Government does not define what it means by the "March 2016" events. The term cannot include the text messages because they occurred in June 2016. More important, prior to its motion for reconsideration, the Government had not made a *res gestae* argument as a basis for admission of the text messages. In the Government's Motion, the Government seeks reconsideration and/or clarification of the Court's Order, which found that the five text messages were inadmissible under Fed. R. Evid 801(d)(2)(E) as coconspirator statements. Nothing in that Order addressed the admissibility of the March 2016 events under any other theory. This argument is inappropriate here.

the day. The court's factual recitation is also silent as to evidence that Davis told officers that he called Archuleta to obtain information about S.C. from his license plate, and that Archuleta had called another party to obtain such information. The court is also silent as to evidence submitted that the owner of the Quick MVD in Espanola admitted to doing regular business with Archuleta. (Doc. 90, p. 2).

In reaching its holding and as stated in its Order, the Court considered all the facts. While the Court specifically referenced the Government's timeline and sequence of events between the two Defendants, the Court did not reference Mr. Davis's call to Officer Cole or Mr. Archuleta's communications with a Quick MVD office.

Mr. Davis's interaction with Officer Cole is not relevant evidence as to whether the two Defendants agreed to enter into a conspiracy. The evidence showed that Mr. Davis called Officer Cole and asked why NMDGF was following him. Officer Cole stated that he did not know who was following Mr. Davis. The Government has not indicated how this encounter is circumstantial evidence of anything other than Mr. Davis's knowledge that someone was following him and that Mr. Davis asked a NMDGF officer why. The evidence offers nothing corroborative as to any agreement between Mr. Archuleta and Mr. Davis.

How Mr. Archuleta obtained Officer S.C.'s address is also irrelevant to this inquiry. Evidence indicating how Mr. Archuleta obtained Officer S.C.'s address included the following: Mr. Archuleta's interactions with Quick MVD,[9] Mr. Davis's statement that Mr. Archuleta gave him the address,[10] and the text messages. For the purposes of the *James* hearing, the Court presumed that the evidence established that Mr. Davis asked Mr. Archuleta to obtain and give Officer S.C.'s address to Mr. Davis and that Mr. Archuleta did so. The Court did not discuss the

---

[9] An affidavit dated April 24, 2017 from Serafino Ortiz, owner of Quick MVD, stated that he had assisted Mr. Archuleta with Motor Vehicle Transactions, "including Title Transfers, Title research and Lost title transactions", but that he did not "specifically recall the 6/9/16 transaction but not sure." (Doc. 41-2, p. 1).

[10] In a NMDGF interview, Mr. Davis told NMDGF officers that he asked a friend to get him Officer S.C.'s address. (Doc. 44-1, p. 8). Subsequently, Mr. Davis identified Mr. Archuleta as the individual who gave him Officer S.C.'s address. (Doc. 44-1, p. 9). Mr. Davis does not indicate at any time during that interview that Mr. Archuleta knew what Mr. Davis was going to do with the address.

facts leading to Mr. Archuleta's procurement of the address because none of that evidence is relevant to the ultimate question before the Court. That question asks if Mr. Archuleta's act of obtaining the address at Mr. Davis's direction coupled with Mr. Davis's subsequent actions support an inference of an agreement between the two of them to do an unlawful act.

The Government argues that it does. The Government contends that because an individual may use an address as a means of intimidating someone, the act of obtaining it and then giving it presupposes an intention to use it for intimidation. This argument begs the question. An individual may acquire an address for many reasons. While one reason may be to intimidate, it is not the sole reason.

The Government's assertion that the only inference the Court can take from the spike in phone calls between the Defendants in March and June 2016 is of an unlawful agreement fails for similar reasons. Two people conversing while one does something that may be unlawful does not establish the other individual's knowledge of or agreement with the first person's acts. Even if there were an inference of knowledge that the first person was doing something wrong, that knowledge does not create voluntary agreement by the other to participate in the wrongdoing.

Assuming arguendo Mr. Archuleta knew that Mr. Davis planned to approach Officer S.C.'s house and Mr. Archuleta knew that Mr. Davis did approach Officer S.C.'s house and that Mr. Archuleta knew that Mr. Davis planned to intimidate or threaten Officer S.C.; the two of them could have had several different types of conversations. In one exchange, Mr. Archuleta may have encouraged Mr. Davis to intimidate Officer S.C. In a different type of conversation, Mr. Archuleta could have been advising Mr. Davis not to approach the house but to walk away. One scenario would make Mr. Archuleta a coconspirator; the other would not. In the absence of any evidence as to the tenor of their conversation, each inference carries equal weight.

Next, the Government argues that there is a parallel between the events of March 2016 and the events of June 2016, and that this parallel creates an inference of an agreement between the Defendants to complete the objectives of the alleged crime. The only parallel between the two events that pertains to both Mr. Archuleta and Mr. Davis is the increase in phone calls between them. An increase in calls does not support an inference that the Defendants agreed in March 2016 or in June 2016 to obstruct Officer S.C. in the performance of his duties through threat or intimidation. Even if Mr. Davis's threats to law enforcement during the execution of the search warrant in March 2016 parallel Mr. Davis's approach to Officer S.C.'s home in June 2016, those acts involve only Mr. Davis. What Mr. Davis did in March 2016 and June 2016 does not and cannot create an inference of an agreement between him and Mr. Archuleta without evidence that Mr. Archuleta knew of and agreed with Mr. Davis's acts.

In the absence of evidence of a knowing, voluntary agreement between Mr. Davis and Mr. Archuleta to prevent Officer S.C. from performing his job by means of intimidation, the text messages are not coconspirator statements that are admissible within the exception delineated in Fed. R. Evid. 801(d)(2)(E).

**B.     The Amount of Evidence Sufficient to Prove a § 372 Conspiracy**

In its Motion, the Government also argues that the Court erred because it did not consider *United States v. Rakes*, 510 F.3d 1280 (10th Cir. 2007). *Rakes* is significant, the Government contends, because it establishes guidance about how much evidence is sufficient to prove a conspiracy under 18 U.S.C. § 372. In contrast, Defendants argue that *Rakes* is inapplicable to the fact situation in this case. The Court agrees that *Rakes* is not persuasive.[11]

---

[11] The Court observes that the Government did not brief or cite *Rakes* on this issue in its Motion to Admit Coconspirator Statements. While admittedly, it referenced *Rakes* at the *James* hearings, the Government's arguments were not developed. Defendants argue that because the Government is raising a new issue, the Court should not consider it here. Because the Government mentioned it in passing, the Court will address it.

One of the issues in *Rakes* was whether the jury had correctly found that a woman who may have been intimidated into writing a threatening letter to an Assistant United States Attorney (AUSA) could be a willing coconspirator under 18 U.S.C. § 372, the same crime charged here. *Rakes*, 510 F.3d at 1284. The defendant argued that because one of the necessary elements of the crime is a knowing and voluntary agreement between two or more parties, a party involuntarily participating could not meet that element. *Id.* The Tenth Circuit found that although there was "alternative and conflicting testimony" about the woman's participation, at least one of the accounts "involve[d] an admission of her knowing and voluntary participation in a scheme with Mr. Rakes." *Id.* Because of that admission, the Tenth Circuit concluded that a rational jury could have found that the woman who wrote the letter was a coconspirator. *Id.* at 1285.

The Government's argument coalesces around dicta in *Rakes*.[12] In addressing the sufficiency of the evidence with respect to the alleged coconspirator, the Tenth Circuit observed that a rational jury could have found from the evidence before it that other individuals, including one who had obtained the address of the AUSA, had knowingly conspired with the defendant. *Id.* However, the Tenth Circuit did not further identify or discuss any evidence before the jury specific to this inquiry because the United States did not brief that issue. *Id.*

*Rakes* is not instructive. Nothing in *Rakes* suggests that in the absence of any other evidence an act, such as obtaining an address and giving it to another, establishes an agreement. What a jury could have found in *Rakes* based on the factual evidence before it is not a finding as a matter of law that obtaining an address for another person makes one a prima facie coconspirator. The issue here is not whether Mr. Archuleta obtained and forwarded an address to

---

[12] Here, none of the evidence shows that either Defendant made an admission of knowing and voluntary participation in a scheme to intimidate Officer S.C. from performing his job. The Government does not argue that point or that *Rakes* is persuasive on that issue.

12

Mr. Davis, but whether he did these actions as part of an agreement to threaten or intimidate a United States official in the performance of his duties. The Government has not met its burden in establishing that agreement.

**C.     Admissibility of the Five Text Messages as Nonassertive Utterances**

The Government next asks that the Court admit the five text messages as nonassertive utterances. Defendants object to the admission of the text messages on this basis. First, Defendants argue that prior to this Motion the Government did not raise or fully brief its argument that the text messages are nonassertive utterances. The Court notes that in the Government's Motion to Admit Coconspirator Statements, without fully briefing the issue, the Government did seek to admit the text messages as non-hearsay. (Doc. 45, p. 4-5). During the *James* hearings, the Government also made vague references to the admissibility of the text messages as nonassertive utterances. Although the Government did not present a fully formed argument based on these theories, the Court will address it.

The Government defines a nonassertive utterance as non-hearsay introduced to provide context to a charged offense. The Government argues that the text messages are commands, instructions, and questions offered to prove only that Mr. Archuleta and Mr. Davis made and received the utterances and not to prove the actual truth of the statements. In opposition, Defendants assert that despite the Government's contention that the text messages are non-hearsay, they are functionally hearsay because the Government is offering them to establish that Mr. Archuleta and Mr. Davis believed the truth of the text messages, specifically, that the messages conveyed Officer S.C's personal information. Whether the text messages are hearsay or non-hearsay is immaterial here, because the text messages are irrelevant.

To be admissible, evidence must be relevant and irrelevant evidence is inadmissible. Fed. R. Evid. 401, 403. "Evidence is relevant, if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. In finding that the five text messages were inadmissible as statements by a coconspirator, the Court found that the text messages did not show an agreement between the two Defendants and therefore, did not support an inference that the two Defendants were coconspirators. Because the text messages do not show an agreement to commit this crime or any other element of 18 U.S.C. § 372, the text messages cannot provide context for the charged offense.

IT IS ORDERED that the Government's Motion is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE